# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS – EL PASO

| | | |
|---|---|---|
| DEXTER BROWN, | ) | |
| | ) | |
| | ) | Case No. 3:26-CV-00397 |
| ESTATE OF | ) | |
| OMAR CHAVARRIA, | ) | |
| by and through Claudia Chavarria, | ) | |
| Personal Representative, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| FERNANDO CORRAL | ) | |
| | ) | |
| DAVID ALDANA | ) | |
| | ) | |
| JOSE ARMENDARIZ | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KRISTI NOEM, | ) | |
| Secretary of the Department | ) | |
| of Homeland Security, | ) | |
| Washington, DC 20528 | ) | |
| In her Official Capacity | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| Serve: | ) | |
| Office of the United States Attorney | ) | |
| El Paso, TX | ) | |
| | ) | |
| United States Attorney General | ) | |
| (Department of Justice) | ) | |
| 950 Pennsylvania Ave. NW | ) | |
| Washington, DC 20530 | ) | |
| _____ | ) | |

## <u>COMPLAINT FOR INJUNCTIVE AND COMPENSATORY RELIEF</u>

Come now Plaintiffs, Dexter Brown (hereinafter "Plaintiff Brown"), Estate of Omar

Chavarria (hereinafter "Plaintiff Chavarria"), Fernando Corral (hereinafter "Plaintiff Corral")

1

David Aldana (hereinafter "Plaintiff Aldana"), and Jose Armendariz (hereinafter "Plaintiff Armendariz") collectively "Plaintiffs," by and through undersigned counsel, on their own behalf, with their Complaint for Injunctive and Compensatory Relief, against Defendant, the Secretary of Homeland Security whose agency includes Homeland Security Investigations (hereinafter "Defendant"), alleging claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., ("Title VII"), and state as follows:

## I.   NATURE OF THE ACTION

1. This is a civil action for unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., including race discrimination, hostile work environment, and retaliation, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., including age discrimination and retaliation.

2. Plaintiffs are current and former Special Agents of Homeland Security Investigations ("HSI") assigned to the El Paso Field Office, a component of U.S. Immigration and Customs Enforcement ("ICE") within the Department of Homeland Security ("DHS").

3. This action arises from systemic discriminatory and retaliatory practices within HSI El Paso, including discriminatory assignment and rotation decisions, manipulation of staffing and workload distribution, tolerance of a racially and age-based hostile work environment, and retaliation against agents who opposed those practices or engaged in protected EEO activity.

4. At the center of Plaintiffs' claims is the Port Enforcement Group ("PEG"), a unit that HSI El Paso management treated as a punitive assignment and disproportionately staffed with older agents and agents of color, while insulating younger and favored agents from PEG's burdens.

2

5. Plaintiffs were subjected to excessive workloads, unpredictable schedules, stigmatization by supervisors, and retaliatory threats, including threats of continuous on-call status, after raising concerns about discriminatory treatment and unequal working conditions.

6. These practices were not isolated incidents. They were carried out by common supervisors, implemented over a sustained period of time, and applied in a manner that disproportionately harmed Plaintiffs and other similarly situated agents.

7. Plaintiffs pursued administrative remedies through the federal-sector EEO process. As described in detail below, the Agency repeatedly failed to comply with regulatory requirements, delayed investigations well beyond mandated deadlines, and issued deficient Final Agency Decisions that failed to meaningfully address Plaintiffs' claims.

8. Plaintiffs bring this action pursuant to statutes that expressly provide for de novo review in federal district court. This Court is not bound by the Agency's findings, credibility determinations, or conclusions of law.

9. Plaintiffs seek declaratory and injunctive relief, back pay, front pay, lost benefits, compensatory damages as permitted by law, liquidated damages for willful ADEA violations, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

## II.   JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiffs' claims arise under the laws of the United States.

11. This action is brought pursuant to 42 U.S.C. § 2000e-16(c) and 29 U.S.C. § 633a(c), which waive sovereign immunity and authorize federal employees to bring civil actions alleging discrimination and retaliation by federal agencies.

12. Plaintiffs have exhausted their administrative remedies, or alternatively have constructively exhausted those remedies due to the Agency's failure to comply with mandatory regulatory deadlines and procedural requirements, as described in detail below.

13. Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3) because Plaintiffs were employed within this District, the unlawful employment practices occurred within this District, and Defendant performs official duties within this District.

## III.   PARTIES

14. Plaintiff Dexter Brown is an African-American Special Agent employed by Homeland Security Investigations and assigned to the El Paso Field Office.

15. Plaintiff Omar Chavarria was a Hispanic Special Agent employed by Homeland Security Investigations and assigned to the El Paso Field Office.

16. In September 2025, while this matter was pending and before the filing of this civil action, Omar Chavarria tragically took his own life.

17. Chavarria's claims survive his death and are brought by the Estate of Omar Chavarria, through his personal representative, Claudia Chavarria, pursuant to applicable law.

18. Plaintiff Fernando Corral is a Hispanic Special Agent employed by Homeland Security Investigations and assigned to the El Paso Field Office.

19. Plaintiff David Aldana is a Hispanic Special Agent employed by Homeland Security Investigations and assigned to the El Paso Field Office.

20. Plaintiff Jose Armendariz is a Hispanic Special Agent employed by Homeland Security Investigations and assigned to the El Paso Field Office.

4

21. At all times relevant, Plaintiffs were federal employees within the meaning of Title VII and the ADEA.

22. Defendant Kristi Noem is the Secretary of the Department of Homeland Security and is sued in her official capacity.

23. DHS is Plaintiffs' employing agency. The Secretary of DHS is the only proper defendant in this federal-sector discrimination action.

## IV.    PERMISSIVE JOINDER UNDER RULE 20

24. Plaintiffs join in this action pursuant to Federal Rule of Civil Procedure 20(a)(1) because their claims arise out of the same transactions, occurrences, and series of transactions or occurrences.

25. Plaintiffs were subjected to discriminatory assignment practices, hostile work environment conditions, and retaliation within the same HSI field office, under the authority of the same supervisory chain of command.

26. Plaintiffs' claims involve common questions of law and fact, including whether HSI El Paso maintained discriminatory assignment and rotation practices, whether supervisory officials engaged in or tolerated retaliatory conduct, and whether PEG functioned as a punitive unit disproportionately affecting older and minority agents.

27. The discriminatory and retaliatory acts complained of were carried out by common decision-makers, including the Special Agent in Charge, Assistant Special Agents in Charge, and Group Supervisors.

28. Plaintiffs' claims are logically related and share overlapping evidence, witnesses, and documentary proof.

29. Joinder will promote judicial economy, avoid inconsistent judgments, and prevent duplication of evidence and testimony.

30. Plaintiffs do not seek class certification and do not purport to represent a class. Each Plaintiff seeks relief based on his own injuries arising from a shared pattern of unlawful conduct.

31. Permissive joinder is appropriate and will not prejudice Defendant.

32. Defendant will not be burdened by joinder because Plaintiffs' claims arise from the same work environment, the same supervisory structure, and the same discriminatory practices.

33. Plaintiffs' claims are properly joined and should proceed together in this action.

34. Joinder is particularly appropriate where, as here, the claims arise from a sustained course of conduct rather than isolated incidents.

35. Plaintiffs' allegations collectively demonstrate a pattern of discrimination and retaliation that cannot be fully understood if fragmented into separate lawsuits.

36. Allowing these claims to proceed together will facilitate a complete and efficient adjudication on the merits.

37. Plaintiffs therefore properly join under Rule 20(a)(1).

## V.    Preliminary Facts and Allegations

38. This action challenges a sustained pattern of discriminatory and retaliatory conduct within the Homeland Security Investigations ("HSI") El Paso Field Office, carried out by common supervisors over multiple years and affecting multiple Special Agents.

39. Plaintiffs' claims arise from a shared work environment, the same supervisory chain of command, and common assignment, staffing, and workload practices that disproportionately burdened older agents and agents of color.

40. Central to Plaintiffs' claims is HSI El Paso's operation of the Port Enforcement Group ("PEG"), which management treated as a punitive assignment rather than a legitimate investigative unit.

41. PEG agents were subjected to chronic understaffing, excessive workloads, unpredictable schedules, and stigmatization by supervisors, while younger and favored agents were insulated from PEG's burdens and rotated into specialty groups.

42. Supervisors openly characterized PEG as a dumping ground for agents perceived as undesirable, including statements that agents who were "not producing" would be sent to PEG, regardless of actual performance.

43. Plaintiffs and other PEG agents repeatedly raised concerns about staffing manipulation, unequal treatment, and unsafe working conditions through internal channels and protected EEO activity.

44. Rather than address these concerns, management escalated hostility toward PEG agents, including threats to impose continuous 24/7 on-call status and other punitive measures.

45. Assignment, rotation, and workload decisions were not governed by neutral or transparent criteria, but by subjective discretion exercised by common decisionmakers.

46. These practices resulted in PEG being disproportionately staffed by older agents and agents of color, while similarly situated younger and non-minority agents were treated more favorably.

47. Plaintiffs' individual experiences, described in detail below, reflect this broader pattern of discrimination and retaliation and cannot be understood in isolation.

48. The discriminatory and retaliatory conduct at issue unfolded over time and constituted a continuing violation, rather than discrete or unrelated acts.

49. Defendant's actions also included procedural misconduct during the administrative EEO process, including delayed and incomplete investigations and deficient Final Agency Decisions.

50. These administrative failures further demonstrate Defendant's knowledge of the underlying misconduct and its efforts to insulate supervisory actions from scrutiny.

51. Plaintiffs bring this action to obtain full relief for violations of federal law and to end the discriminatory and retaliatory practices described herein.

## VI. AGENCY BACKGROUND, HSI EL PASO STRUCTURE, AND THE PORT ENFORCEMENT GROUP ("PEG")

### A. The Department of Homeland Security, ICE, and Homeland Security Investigations

52. The Department of Homeland Security ("DHS") is a federal executive agency charged with protecting the United States from threats to national security, enforcing federal immigration laws, and safeguarding the nation's borders.

53. U.S. Immigration and Customs Enforcement ("ICE") is a component agency of DHS. ICE is responsible for enforcing federal laws governing border control, customs, trade, and immigration, and for investigating transnational criminal organizations engaged in narcotics trafficking, human smuggling, money laundering, firearms offenses, and related crimes.

54. Homeland Security Investigations ("HSI") is the principal investigative arm of ICE. HSI Special Agents are federal criminal investigators authorized to conduct complex, long-term investigations, execute search and arrest warrants, coordinate with federal prosecutors, and work jointly with state, local, and international law-enforcement partners.

55. HSI offices are organized geographically into field offices, each led by a Special Agent in Charge ("SAC"), with subordinate Assistant Special Agents in Charge ("ASACs"), Group Supervisors ("GS"), and Acting Group Supervisors ("A/GS"). These supervisors exercise broad discretion over agent assignments, unit placement, scheduling, overtime, TDYs, and day-to-day operational decisions.

56. At all times relevant to this action, Plaintiffs were assigned to the HSI El Paso Field Office, which exercises jurisdiction over a large and complex Area of Responsibility encompassing multiple Ports of Entry, extensive border infrastructure, and high-volume narcotics and smuggling corridors.

### B.  The Mission and Operational Environment of HSI El Paso

57. HSI El Paso operates in one of the most operationally demanding environments in the country. Agents are responsible for responding to port-based narcotics interdictions, coordinating with U.S. Customs and Border Protection ("CBP"), investigating transnational criminal organizations, and supporting joint task forces involving federal, state, and local agencies.

58. The El Paso Field Office is structured into multiple investigative groups, often referred to internally as "specialty groups," which may focus on areas such as narcotics trafficking, financial crimes, gang investigations, or other mission-specific priorities.

59. In addition to these specialty groups, HSI El Paso established a unit designated as the Port Enforcement Group ("PEG"), which was tasked with responding to narcotics-related enforcement activity originating at Ports of Entry.

60. Although HSI leadership publicly described PEG as a mission-critical operational unit, in practice PEG was treated differently from other investigative groups in terms of staffing, workload distribution, scheduling expectations, and supervisory treatment.

### C. Creation and Function of the Port Enforcement Group ("PEG")

61. The Port Enforcement Group was created to serve as a rapid-response unit for narcotics interdictions occurring at Ports of Entry within the El Paso Area of Responsibility.

62. PEG agents were expected to respond to duty calls at all hours, including nights, weekends, and holidays, and to assume responsibility for arrests, evidence handling, interviews, report preparation, and coordination with prosecutors.

63. Unlike specialty groups, which were generally insulated from routine port duty, PEG agents were required to remain effectively on-call for extended periods and to absorb the operational burden of port-based enforcement activity for the entire office.

64. From its inception, PEG was chronically understaffed. Although management stated that staffing levels were sufficient, the number of agents actually available to perform PEG duties was far lower than reflected on internal rosters.

65. Supervisors routinely counted agents as assigned to PEG who were unavailable due to TDYs, medical restrictions, collateral duties, or other assignments, artificially inflating staffing numbers and masking the true operational strain placed on PEG agents.

66. As a result, PEG agents routinely carried disproportionate workloads, handled a majority of narcotics arrests for the El Paso office, and worked extended schedules without meaningful relief or rotation.

### D.  Disparate Treatment of PEG Compared to Specialty Groups

67. While PEG agents were subjected to continuous port duty and excessive workloads, agents assigned to specialty groups were largely shielded from these demands.

68. Prior to the formation of PEG, all narcotics agents including specialty narcotic groups were on a daily schedule.

69. Specialty group agents were permitted to focus on long-term investigations, enjoyed more predictable schedules, and were not required to absorb the same volume of reactive enforcement activity.

70. Management failed to implement neutral or transparent criteria for rotating agents into and out of PEG. Instead, assignment decisions were made subjectively by supervisors and resulted in PEG being disproportionately staffed by older agents and agents of color.

71. Younger agents and favored agents were routinely rotated out of PEG within short periods, while older agents were told they would have to "work their way out" of the unit regardless of performance.

72. This disparate treatment was not based on legitimate operational needs. PEG agents consistently produced arrests, seizures, and prosecutable cases at rates comparable to or exceeding those of specialty groups.

### E.  Supervisory Animus and Stigmatization of PEG Agents

72. HSI El Paso supervisors openly stigmatized PEG as a punitive assignment rather than a valued operational unit.

73. On or about June 1, 2023, the SAC stated during a management or advisory meeting that "agents who are not producing will be sent to PEG."

11

74. This statement explicitly characterized PEG as a dumping ground for allegedly underperforming agents and reinforced the perception that PEG assignment was a form of punishment rather than a legitimate career assignment.

75. Supervisory officials further reinforced this stigma through derogatory remarks about PEG agents' motivation and work ethic, including statements that PEG agents "don't want to do anything," "don't carry their weight," and "are not motivated."

76. These statements were made in the presence of other law-enforcement partners, including CBP Task Force Officers, and materially damaged the professional reputations of PEG agents within and outside HSI.

77. Despite being aware of these statements and their impact, HSI leadership failed to correct or discipline supervisors responsible for making them.

### F.   Retaliatory Escalation and Management Response to Complaints

78. Multiple PEG agents raised concerns regarding understaffing, excessive workloads, and unequal treatment through internal channels and protected EEO activity.

79. Rather than addressing these concerns, HSI El Paso management responded with hostility and retaliatory threats.

80. Supervisors warned that if PEG agents continued to complain or engage in EEO activity, PEG would be placed on **continuous 24/7 on-call status**, further worsening already onerous working conditions.

81. These threats were communicated in meetings and discussions involving PEG agents and were intended to deter protected activity by making working conditions even more punitive.

82. Management's response sent a clear message that raising concerns about discrimination or unequal treatment would result in harsher conditions, not remediation.

### G.  Conflict Between Agency Policy and Actual Practice

83. In April 2024, HSI El Paso leadership circulated a Professional Conduct memorandum stating that the workplace must be free of discrimination, harassment, and bias, and that conscious or unconscious prejudices had no place within the organization.

84. Despite these stated commitments, supervisors continued to engage in stigmatizing conduct, retaliatory threats, and discriminatory assignment practices affecting PEG agents.

85. The contrast between HSI's stated policies and its actual practices underscores the pretextual nature of management's justifications and demonstrates knowledge and tolerance of discriminatory conduct at the supervisory level.

### H.  Pattern and Practice of Discrimination and Retaliation

86. The conditions imposed on PEG agents were not isolated or accidental. They reflected a pattern of discriminatory and retaliatory conduct carried out by common supervisors within HSI El Paso.

87. This pattern included discriminatory assignment decisions, disparate workloads, stigmatizing statements, retaliatory threats, and indifference to the professional and personal impact on affected agents.

88. Plaintiffs' individual experiences, described in detail below, occurred within this broader context of systemic misconduct and cannot be understood in isolation.

VIII.   **THE FEDERAL SECTOR EEO PROCESS, AGENCY NONCOMPLIANCE, AND PROCEDURAL IRREGULARITIES**

### A. The Federal-Sector EEO Framework

89. Federal employees alleging discrimination are required to pursue administrative remedies pursuant to Title VII, the ADEA, and 29 C.F.R. Part 1614 before filing suit in federal district court.

90. The federal-sector EEO process is intended to provide a fair, timely, and thorough investigation of discrimination complaints, including the development of an adequate factual record through witness interviews, documentary evidence, and sworn affidavits.

91. Once a federal employee files a formal complaint, the employing agency is required to complete a Report of Investigation ("ROI") within 180 days, unless the complainant agrees to an extension. 29 C.F.R. § 1614.108(e).

92. If the agency fails to timely complete the investigation, the complainant may request a hearing before an EEOC Administrative Judge ("AJ") or proceed directly to federal court. 29 C.F.R. § 1614.407.

93. These procedural protections are critical because federal-sector discrimination cases are subject to de novo review in district court, and agency misconduct during the administrative process may itself constitute evidence of discrimination, retaliation, or pretext.

### B. Plaintiffs' EEO Complaints and Common Procedural History

94. Each Plaintiff in this action timely initiated EEO counselor contact after experiencing discriminatory assignments, hostile work environment conditions, and retaliation within HSI El Paso.

95. Each Plaintiff thereafter filed a formal EEO complaint alleging discrimination based on race, age, and retaliation arising from assignment to the Port Enforcement Group ("PEG"), unequal workloads, stigmatization by supervisors, and retaliatory escalation after engaging in protected activity.

96. Although the Plaintiffs' complaints were filed separately, they raised substantially identical factual allegations, involved the same supervisory officials, and concerned the same discriminatory practices within HSI El Paso.

97. The Agency was therefore on notice that the allegations were not isolated incidents, but reflected a broader pattern of discriminatory and retaliatory conduct affecting multiple agents.

### C. The Agency's Failure to Timely Complete Reports of Investigation

98. In each Plaintiff's case, DHS/ICE failed to complete the Report of Investigation within the required 180-day period.

99. The Agency did not seek or obtain valid extensions from Plaintiffs and offered no legitimate justification for its repeated failures to comply with regulatory deadlines.

100. As a result, Plaintiffs received Notices of Incomplete Investigation, confirming that the Agency had failed to meet its obligations under 29 C.F.R. § 1614.108.

101. The Agency's delays were not minor or technical. In several cases, ROIs were produced many months after the regulatory deadline, long after witnesses had retired, transferred, or otherwise become unavailable.

102. These delays materially prejudiced Plaintiffs by impairing their ability to secure sworn testimony, preserve contemporaneous evidence, and obtain a fair administrative adjudication.

### D. Motions for Default Judgment and Sanctions

103. Because of the Agency's repeated failures to timely complete investigations, Plaintiffs filed motions for default judgment and/or sanctions before the EEOC Administrative Judges assigned to their cases.

104. These motions documented the Agency's noncompliance, the prejudice suffered by Plaintiffs, and the systemic nature of the investigative failures across multiple cases.

105. Rather than acknowledge its noncompliance, the Agency responded by attempting to shift blame onto Plaintiffs, including by falsely asserting that Plaintiffs had failed to cooperate in the investigative process.

106. These assertions were untrue. Plaintiffs did not refuse to participate in investigations; rather, counsel advised that participation in affidavits or interviews should be deferred while motions addressing the Agency's regulatory violations were pending.

107. The Agency's attempt to portray Plaintiffs' procedural objections as noncooperation was inconsistent with the record and ignored Plaintiffs' pending motions addressing regulatory violations.

### E. Administrative Procedural Background

108. In at least one Plaintiff's case, the assigned Administrative Judge dismissed motions for sanctions without addressing the Agency's documented noncompliance with investigative deadlines.

109. In that same case, the Administrative Judge concluded that the complainant had failed to participate in the investigation, despite documentary evidence to the contrary.

110.  The Administrative Judge then proceeded to set a briefing schedule for summary judgment motions without first holding a status conference or issuing a scheduling order, depriving Plaintiffs of meaningful procedural protections.

111.  Faced with an administrative forum that had failed to enforce regulatory deadlines or provide fair procedures, Plaintiffs reasonably elected to withdraw from the hearing process.

### F.  Strategic Withdrawal from the Hearing Process

112.  Pursuant to 29 C.F.R. § 1614.110(b), Plaintiffs withdrew their requests for EEOC hearings and requested issuance of Final Agency Decisions ("FADs").

113.  Plaintiffs' withdrawals were not tactical concessions on the merits. They were necessitated by the Agency's investigative failures and the administrative forum's unwillingness to remedy those failures.

114.  Plaintiffs expressly preserved their right to seek de novo review in federal district court.

### G.  Deficiencies in the Final Agency Decisions

115.  The Final Agency Decisions issued in Plaintiffs' cases uniformly found no discrimination or retaliation.

116.  The FADs relied heavily on boilerplate language, credited management explanations without meaningful analysis, and failed to grapple with corroborated evidence of discriminatory animus and retaliation.

117.  In multiple cases, the FADs failed to address amended claims that had been accepted during the administrative process.

118.  The Agency also dismissed certain claims as untimely based on an overly rigid application of the 45-day counseling requirement, ignoring the continuing nature of the discriminatory conduct and the fact that the discriminatory character of PEG assignments was not immediately apparent.

119. Even where the Agency purported to address hostile work environment claims, it improperly parsed allegations into isolated discrete acts rather than evaluating the cumulative effect of ongoing conduct, contrary to controlling Supreme Court precedent.

120. These deficiencies reflect not a neutral adjudication, but an Agency determination process designed to insulate supervisory misconduct from scrutiny.

### H. Constructive Exhaustion, Continuing Violation, and De Novo Review

121. Plaintiffs have fully exhausted their administrative remedies, or alternatively have constructively exhausted those remedies due to the Agency's failure to comply with regulatory requirements.

122. Plaintiffs' claims are timely under the continuing-violation doctrine, as the discriminatory and retaliatory conduct consisted of repeated acts and conditions that collectively altered the terms and conditions of employment.

123. Even where specific acts occurred outside the 45-day counseling window, those acts are admissible as background evidence and are part of the same hostile work environment.

124. Plaintiffs bring this action pursuant to statutes that expressly provide for de novo review, and this Court is not bound by the Agency's findings, credibility determinations, or conclusions of law.

### I. Agency Misconduct as Evidence of Pretext

125. The Agency's repeated failure to timely investigate, its shifting explanations for delays, its attempts to blame Plaintiffs for the Agency's own noncompliance, and the deficiencies in the FADs constitute evidence of pretext.

126. These procedural failures are probative of discriminatory and retaliatory intent, particularly where the same supervisors were implicated in both the underlying misconduct and the Agency's defensive posture during the EEO process.

127. Plaintiffs' claims must therefore be evaluated based on the full factual record developed in this Court, not the flawed administrative proceedings.

## IX.    PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

### PLAINTIFF #1 – DEXTER BROWN

#### A.  Background, Experience, and Qualifications

129. Plaintiff Dexter Brown is an African-American Special Agent with Homeland Security Investigations ("HSI") assigned to the El Paso Field Office. At all times relevant to this action, Brown was a fully credentialed federal criminal investigator entrusted with complex and sensitive law-enforcement responsibilities.

130. Brown's investigative experience spans narcotics trafficking, firearms offenses, human smuggling and trafficking, immigration fraud, customs trade fraud, transnational gang activity, financial crimes, money laundering, commercial fraud, intellectual property theft, and national security-related investigations.

131. From approximately 2017 to 2020, Brown was assigned to the Sierra Blanca Border Enforcement Security Task Force ("BEST") Group, where he investigated large-scale human smuggling operations. His duties included long-term investigations, intelligence development, surveillance, preparation of affidavits, execution of federal search and arrest warrants, and coordination with federal prosecutors and partner agencies.

132. Brown later participated in Operation Community Shield, a DHS-wide initiative targeting violent transnational criminal organizations and gangs. In that capacity, Brown

conducted gang-related investigations, supported joint operations, and contributed to enforcement actions against dangerous criminal networks.

133.   Brown's performance was repeatedly recognized by HSI. He received, among other commendations, a Certificate of Appreciation from the El Paso Gang Group recognizing his contributions to the investigation of the Artistas Asesinos Transnational Criminal Organization in June 2021, as well as a 10-Year Federal Service Award and other performance-based recognitions.

134.   Prior to the events giving rise to this action, Brown had no history of performance deficiencies, discipline, or adverse personnel actions. He was regarded as a capable and productive agent.

### B.  Assignment to the Port Enforcement Group

135.   In or around September 2021, HSI El Paso management assigned Brown to the Port Enforcement Group ("PEG").

136.   Brown did not request assignment to PEG. The assignment was made through supervisory discretion rather than neutral or transparent criteria.

137.   At the time of Brown's assignment, PEG was widely regarded within the El Paso office as a punitive and undesirable unit, characterized by excessive workloads, chronic understaffing, and limited opportunities for advancement or rotation.

138.   Unlike specialty investigative groups, PEG agents were required to respond to port-based narcotics duty calls on a near-constant basis, often with little advance notice and without predictable schedules.

139.    Once assigned to PEG, Brown was required to absorb a disproportionate share of enforcement activity, including arrests, evidence handling, interviews, report preparation, and coordination with prosecutors, often across multiple Ports of Entry.

140.    Despite PEG agents accounting for a significant percentage of the El Paso office's arrests, management consistently minimized their contributions and treated PEG as a dumping ground rather than a legitimate investigative assignment.

### C.  Disparate Treatment and Racially Discriminatory Assignment Practices

141.  During Brown's tenure in PEG, management failed to apply neutral criteria for rotating agents into and out of the unit.

142.  Younger agents and favored agents were routinely rotated out of PEG after relatively short periods, while Brown and other older agents and agents of color were told they would have to "work their way out" of the unit regardless of performance.

143.  Brown observed that incoming transfers with limited border-enforcement experience were placed directly into specialty groups, bypassing PEG entirely, while experienced agents like Brown remained trapped in PEG.

144.  These assignment decisions were not based on legitimate operational needs. Brown consistently performed PEG duties competently and productively, yet remained assigned to PEG long after similarly situated non-Black agents were rotated out.

145.  The disparate treatment Brown experienced was consistent with a broader pattern in which PEG was disproportionately staffed by **older agents and agents of color**, while specialty groups remained disproportionately staffed by younger and non-minority agents.

### D.  Hostile Work Environment and Supervisory Animus

146.  Supervisory officials openly stigmatized PEG and the agents assigned to it.

147.  On or about June 1, 2023, the Special Agent in Charge stated during a meeting that "agents who are not producing will be sent to PEG."

148.  This statement explicitly branded PEG as a punishment assignment and implied that agents assigned to PEG were underperforming or deficient, regardless of actual performance.

149.  Supervisors and managers made additional derogatory remarks about PEG agents, portraying them as unmotivated and unwilling to work. These statements were made in the presence of other law-enforcement partners and damaged Brown's professional reputation.

150.  Management ignored repeated complaints from PEG agents, including Brown, regarding chronic understaffing, excessive workloads, and unequal treatment.

151.  Rather than address these concerns, supervisors conveyed indifference to the impact of PEG conditions on agents' families, health, and safety.

152.  The cumulative effect of these conditions created a hostile work environment that altered the terms and conditions of Brown's employment.

### E.  Protected Activity

153.   Brown engaged in **protected EEO activity** by opposing discriminatory assignment practices, hostile work environment conditions, and unequal treatment within PEG.

154.  Brown raised concerns internally and through the EEO process regarding staffing manipulation, disparate workloads, stigmatization of PEG agents, and retaliatory conduct by supervisors.

155.  Management was aware of Brown's protected activity.

**F.   Retaliation Following Protected Activity**

156.   After Brown engaged in protected EEO activity, HSI El Paso management escalated its response.

157.   On or about November 15, 2023, an Acting Assistant Special Agent in Charge threatened to place PEG agents on continuous 24/7 on-call status if they continued to raise concerns or pursue EEO complaints.

158.   This threat constituted a materially adverse action that would dissuade a reasonable employee from engaging in protected activity.

159.   The threat was communicated in the context of ongoing complaints by PEG agents and was intended to punish and silence those who challenged discriminatory practices.

160.   Management's response made clear that Brown's protected activity would result in harsher working conditions rather than remediation.

161.   In addition to the retaliatory threats and adverse actions described above, following Brown's protected EEO activity, HSI El Paso management subjected him to retaliatory pay and scheduling practices that constituted materially adverse employment actions.

162.   Beginning in or around November 2023 and continuing through at least mid-2024, Brown was required to work mandatory overtime weeks in excess of those required of similarly situated younger agents, without legitimate operational justification.

163.   During this same period, Brown was denied overtime compensation, night differential pay, and Sunday or holiday premium pay for work he performed, despite being eligible for such compensation under applicable policies and despite similarly situated younger agents receiving such pay.

164. Management simultaneously transferred or rotated younger agents out of PEG, while informing Brown and other older agents that they would be required to "work their way out" of the unit, thereby subjecting Brown to increased overtime and lost compensation.

165. These pay and scheduling decisions were not the result of neutral policy application, but were imposed after and because of Brown's protected EEO activity, and would dissuade a reasonable employee from engaging in protected conduct.

166. Defendant's explanations for these actions were false and pretextual, and the retaliatory nature of the conduct is further evidenced by its timing, selective application, and inconsistency with prior practices.

### G.  Administrative Exhaustion

167.  Brown timely initiated EEO counselor contact and filed a formal EEO complaint alleging discrimination based on race, age, hostile work environment, and retaliation.

168. The Agency failed to timely complete the Report of Investigation within the required regulatory timeframe.

169. Brown pursued administrative remedies through the EEOC process and ultimately received a Final Agency Decision.

170. Brown has exhausted all administrative remedies, or alternatively constructively exhausted those remedies due to the Agency's failure to comply with regulatory obligations.

### H.  Harm and Damages

171. As a result of Defendant's discriminatory and retaliatory conduct, Brown suffered loss of professional standing, diminished career opportunities, emotional distress, and disruption to his family and personal life.

172. Brown was forced to endure excessive workloads, unpredictable schedules, and a hostile work environment solely because of his race and his decision to oppose unlawful practices.

173. Defendant's conduct caused continuing harm that can only be remedied through judicial intervention.

## PLAINTIFF #2 – ESTATE OF OMAR CHAVARRIA

### A. Background, Experience, and Qualifications

174. Plaintiff Omar Chavarria was a Hispanic Special Agent with Homeland Security Investigations ("HSI") assigned to the El Paso Field Office. At all times relevant, Chavarria was a fully credentialed federal criminal investigator entrusted with complex, high-risk enforcement responsibilities.

175. Chavarria served HSI with distinction and was repeatedly assigned to demanding operational roles involving narcotics interdiction, port-based enforcement, and transnational criminal investigations. His duties included responding to port seizures, conducting interviews and interrogations, preparing investigative reports, coordinating with federal prosecutors, and executing enforcement actions alongside partner agencies.

176. Chavarria was recognized for his professionalism, dedication, and investigative competence. During his career, he received commendations including recognition related to Operation Community Shield, a DHS-wide initiative targeting violent transnational criminal organizations, and additional certificates reflecting his service and contributions.

177. Prior to the events described herein, Chavarria had no record of disciplinary issues or performance deficiencies and was regarded as a capable and committed Special Agent.

### B. Assignment to the Port Enforcement Group

25

178. In or around October 2021, HSI El Paso management assigned Chavarria to the Port Enforcement Group ("PEG").

179. Chavarria did not request assignment to PEG. The decision was made through supervisory discretion without transparent criteria or consideration of rotation equity.

180. At the time of Chavarria's assignment, PEG was already known within the El Paso office as an undesirable unit characterized by chronic understaffing, excessive workloads, and limited opportunities for professional advancement or rotation.

181. PEG agents were required to respond to narcotics-related port duty calls at all hours, including nights, weekends, and holidays, often with little notice and without predictable scheduling.

182. As a PEG agent, Chavarria was required to assume responsibility for arrests, evidence handling, interviews, report preparation, and coordination with prosecutors, frequently across multiple Ports of Entry.

## C. Disparate Treatment and Unequal Assignment Practices

183. During Chavarria's tenure in PEG, HSI El Paso management failed to apply neutral or consistent criteria for rotating agents into and out of the unit.

184. Younger agents and favored agents were routinely rotated out of PEG after relatively short periods, while Chavarria and other older agents and agents of color were told they would need to "work their way out" of PEG regardless of performance.

185. Incoming transfers with limited border-enforcement experience were placed directly into specialty groups, bypassing PEG entirely, while experienced agents like Chavarria remained assigned to PEG.

186. These assignment practices were not driven by legitimate operational needs. PEG agents, including Chavarria, consistently produced arrests and enforcement results comparable to or exceeding those of specialty units.

187. The disparate treatment experienced by Chavarria was consistent with a broader pattern in which PEG was disproportionately staffed by older agents and agents of color, while specialty groups remained disproportionately staffed by younger and non-minority agents.

### D. Hostile Work Environment and Supervisory Stigmatization

188. Supervisory officials within HSI El Paso openly stigmatized PEG and the agents assigned to the section.

189. On or about June 1, 2023, the Special Agent in Charge stated during a meeting that "agents who are not producing will be sent to PEG."

190. This statement explicitly characterized PEG as a punishment assignment and conveyed that agents assigned to PEG were underperforming or deficient, regardless of actual performance.

191. Supervisors and managers made additional derogatory remarks portraying PEG agents as unmotivated and unwilling to work. These statements were made in the presence of other law-enforcement partners, including CBP personnel, and damaged Chavarria's professional reputation.

192. Management ignored repeated complaints from PEG agents regarding understaffing, excessive workloads, and unequal treatment, and instead conveyed indifference to the impact of PEG conditions on agents' families, health, and well-being.

193. The cumulative effect of these conditions created a hostile work environment that altered the terms and conditions of Chavarria's employment.

### E. Protected Activity

194. Chavarria engaged in protected EEO activity by opposing discriminatory assignment practices, hostile working conditions, and unequal treatment within PEG.

195. Chavarria raised concerns internally and through the EEO process regarding staffing manipulation, excessive workloads, stigmatization of PEG agents, and retaliatory conduct by supervisors.

196. HSI El Paso management was aware of Chavarria's protected activity.

### F. Retaliation Following Protected Activity

197. After Chavarria engaged in protected EEO activity, HSI El Paso management escalated its response.

198. On or about November 15, 2023, an Acting Assistant Special Agent in Charge threatened to place PEG agents on continuous 24/7 on-call status if they continued to complain or pursue EEO remedies.

199. This threat constituted a materially adverse action that would dissuade a reasonable employee from engaging in protected activity.

200. In or around December 2024, shortly after engaging in protected EEO activity, Chavarria was selected as the only Special Agent out of approximately one hundred agents in the El Paso Field Office for a mandatory temporary duty assignment ("TDY") to Tucson, Arizona.

201. Management provided shifting and inconsistent explanations for Chavarria's selection, and the TDY decision was not based on neutral or objective criteria.

202. The timing and circumstances of the TDY assignment demonstrate that it was imposed in retaliation for Chavarria's protected activity.

203.   Following Chavarria's protected EEO activity, HSI El Paso management subjected him to retaliatory pay and workload practices in addition to the adverse actions already described.

204.   Beginning in or around November 2023 and continuing into 2024, Chavarria was required to work mandatory overtime in excess of agency requirements, while younger agents were rotated out of PEG or otherwise insulated from such demands.

205.   During this period, Chavarria was denied overtime compensation, night differential pay, and holiday or Sunday premium pay for work performed, despite eligibility and despite similarly situated younger agents receiving such compensation.

206.   Management justified these practices by asserting that Chavarria and other older agents would have to "work their way out" of PEG, while younger agents were transferred out of the unit without similar conditions.

207.   These actions occurred after and because of Chavarria's protected EEO activity and were intended to punish and deter him from opposing discriminatory practices.

208.   The retaliatory nature of this conduct is demonstrated by its timing, selective application, and its escalation following Chavarria's protected activity, and constitutes a materially adverse employment action under Title VII and the ADEA.

### G.  Administrative Exhaustion

209.   Chavarria timely initiated EEO counselor contact and filed a formal EEO complaint alleging discrimination based on race, age, hostile work environment, and retaliation.

210.   The Agency failed to timely complete the Report of Investigation within the regulatory timeframe.

211.  Chavarria pursued administrative remedies through the EEOC process and ultimately received a Final Agency Decision.

212.  Chavarria exhausted all administrative remedies, or alternatively constructively exhausted those remedies due to the Agency's failure to comply with its regulatory obligations.

### H.  Death and Survival of Claims

213.  In September 2025, while this matter was pending and before the filing of this civil action, Omar Chavarria tragically died during the pendency of these claims.

214.  Chavarria's death occurred after prolonged exposure to discriminatory and retaliatory working conditions, including excessive workloads, stigmatization, and adverse actions following protected activity.

215.  Chavarria's claims survive his death and are properly brought by the Estate of Omar Chavarria, through his personal representative, Claudia Chavarria, pursuant to applicable law.

### I.  Harm and Damages

216.  As a result of Defendant's discriminatory and retaliatory conduct, Chavarria suffered loss of professional standing, emotional distress, and disruption to his personal and family life.

217.  Defendant's actions deprived Chavarria of the opportunity to work in a discrimination-free environment and to pursue his career free from retaliation.

218.  The harm suffered by Chavarria and his Estate can only be remedied through judicial intervention.

**PLAINTIFF #3 – FERNANDO CORRAL**

### A.  Background, Experience, and Qualifications

219.  Plaintiff Fernando Corral is a Hispanic Special Agent with Homeland Security Investigations ("HSI") assigned to the El Paso Field Office. At all times relevant, Corral was a fully credentialed federal criminal investigator with extensive experience in complex enforcement operations.

220.  Corral has more than a decade of federal law-enforcement experience, including assignments involving narcotics trafficking, Organized Crime Drug Enforcement Task Force ("OCDETF") investigations, High Intensity Drug Trafficking Area ("HIDTA") operations, and human trafficking cases.

221.  Throughout his career, Corral consistently performed at or above expectations and was entrusted with significant investigative responsibilities. He received commendations for his service, including a Department of Homeland Security Letter of Appreciation signed by the Secretary of Homeland Security, reflecting his professionalism and contributions to mission success.

222.  Prior to the events giving rise to this action, Corral had no history of discipline, performance deficiencies, or adverse personnel actions and was regarded as a capable and reliable agent.

### B.  Involuntary Assignment to the Port Enforcement Group

223.  In or around 2023, while Corral was deployed on a federal mission assignment, HSI El Paso management involuntarily assigned him to the Port Enforcement Group ("PEG").

224.  Corral did not request assignment to PEG and was not afforded any meaningful opportunity to object or seek reconsideration of the assignment.

225.  At the time of Corral's assignment, PEG was widely known within the El Paso Field Office as a punitive and undesirable unit characterized by chronic understaffing, excessive workloads, and limited opportunities for rotation or advancement.

226.  Despite Corral's experience in complex investigations, management assigned him to PEG rather than placing him in a specialty group consistent with his background and qualifications.

### C.  Disparate Treatment and Unequal Rotation Practices

227.  During Corral's tenure in PEG, HSI El Paso management failed to apply neutral or objective criteria for rotating agents into and out of the unit.

228.  Younger agents and favored agents were routinely rotated out of PEG after relatively brief assignments, while Corral and other older agents and agents of color remained assigned to PEG for extended periods.

229.  Corral observed that agents with less experience and fewer qualifications were assigned directly to specialty groups, bypassing PEG entirely.

230.  Management justified Corral's continued PEG assignment with vague and shifting explanations unrelated to performance or operational necessity.

231.  These practices were consistent with a broader pattern in which PEG was disproportionately staffed by older agents and agents of color, while younger and non-minority agents were insulated from PEG's burdens.

### D.  Hostile Work Environment Conditions

232.  As a PEG agent, Corral was subjected to excessive workloads, unpredictable schedules, and a near-constant on-call expectation.

233. PEG agents were required to absorb a disproportionate share of port-based narcotics enforcement activity, including arrests, evidence handling, interviews, and report preparation, often with minimal staffing support.

234. Supervisors minimized PEG agents' contributions and openly stigmatized PEG as a punishment assignment rather than a legitimate investigative unit.

235. Corral experienced the same hostile conditions described in Sections IV and V, including supervisory indifference to complaints about understaffing and workload inequities.

236. The cumulative effect of these conditions altered the terms and conditions of Corral's employment and created a hostile work environment.

### E.  Protected Activity

237. Corral engaged in protected EEO activity by opposing discriminatory assignment practices, hostile work environment conditions, and unequal treatment of PEG agents.

238. Corral raised concerns internally and through the EEO process regarding his involuntary assignment to PEG, the lack of rotation equity, and the disparate treatment of older and minority agents.

239. HSI El Paso management was aware of Corral's protected activity.

### F.  Retaliation Following Protected Activity

240. After Corral engaged in protected EEO activity, management subjected him to retaliatory actions intended to punish and deter further opposition.

241. Corral was removed from an Acting Group Supervisor ("A/GS") role and denied leadership opportunities for which he was qualified.

242. Management threatened to impose harsher working conditions on PEG agents who continued to complain, including the possibility of continuous on-call status.

243. These actions constituted materially adverse employment actions that would dissuade a reasonable employee from engaging in protected activity.

### G. Administrative Exhaustion

244. Corral timely initiated EEO counselor contact and filed a formal EEO complaint alleging discrimination based on race, age, hostile work environment, and retaliation.

245. The Agency failed to timely complete the Report of Investigation within the required regulatory timeframe.

246. Corral pursued administrative remedies through the EEOC process, including filing motions addressing the Agency's noncompliance, and ultimately received a Final Agency Decision.

247. Corral has exhausted all administrative remedies, or alternatively constructively exhausted those remedies due to the Agency's failure to comply with regulatory obligations.

### H. Harm and Damages

248. As a result of Defendant's discriminatory and retaliatory conduct, Corral suffered loss of professional opportunities, reputational harm, emotional distress, and disruption to his career trajectory.

249. Corral was denied the opportunity to work in a discrimination-free environment and to compete fairly for assignments and leadership roles.

250. Defendant's conduct caused continuing harm that can only be remedied through judicial intervention.

**PLAINTIFF #4 – DAVID ALDANA**

### A. Background, Experience, and Qualifications

251. Plaintiff David Aldana is a Hispanic Special Agent with Homeland Security Investigations ("HSI") assigned to the El Paso Field Office. At all times relevant to this action, Aldana was a fully credentialed federal criminal investigator with extensive law-enforcement experience.

252. Aldana has more than twenty-seven years of law-enforcement service, including federal investigative experience with HSI. Over the course of his career, Aldana developed significant expertise in narcotics interdiction, border enforcement operations, and coordination with federal, state, and local law-enforcement partners.

253. Aldana's experience and tenure placed him among the most seasoned agents in the El Paso Field Office. He was routinely relied upon for his institutional knowledge, operational judgment, and ability to manage complex enforcement responsibilities.

254. Prior to the events giving rise to this action, Aldana had no history of disciplinary action or performance deficiencies and was regarded as a dependable and effective Special Agent.

### B. Assignment to the Port Enforcement Group

255. In or around 2022, HSI El Paso management assigned Aldana to the Port Enforcement Group ("PEG").

256. Aldana did not request assignment to PEG and was not provided neutral or objective criteria explaining why he was selected for the assignment.

257. At the time of Aldana's assignment, PEG was widely regarded within the El Paso Field Office as an undesirable and punitive unit characterized by excessive workloads, chronic understaffing, and limited opportunities for rotation or professional advancement.

258.  Despite Aldana's extensive experience and seniority, management assigned him to PEG rather than placing him in a specialty group consistent with his background and qualifications.

### C.  Disparate Treatment and Age-Based Assignment Practices

259.  During Aldana's tenure in PEG, HSI El Paso management failed to apply consistent or neutral criteria for agent rotation.

260.  Younger agents were routinely rotated out of PEG after short periods, while older agents such as Aldana were retained in PEG for extended durations regardless of performance.

261.  Aldana observed that less experienced agents were placed directly into specialty groups and insulated from PEG's burdens, while senior agents were required to absorb the most demanding port-based enforcement responsibilities.

262.  Management justified Aldana's continued PEG assignment with vague references to "operational needs," despite the availability of alternative staffing options and Aldana's demonstrated qualifications for other assignments.

263.  These practices disproportionately burdened older agents, including Aldana, and reflected age-based discrimination in assignment and rotation decisions.

### D.  Hostile Work Environment Conditions

264.  As a PEG agent, Aldana was subjected to excessive workloads, unpredictable schedules, and near-constant on-call expectations.

265.  PEG agents were required to respond to port-based narcotics interdictions across multiple Ports of Entry, often with insufficient staffing and limited supervisory support.

266.  Supervisors minimized PEG agents' contributions and treated PEG as a dumping ground rather than a legitimate investigative unit.

267. Aldana experienced repeated disregard by management when raising concerns about staffing shortages, workload inequities, and the physical and emotional toll of PEG conditions.

268. The cumulative effect of these conditions altered the terms and conditions of Aldana's employment and created a hostile work environment.

### E. Protected Activity

269. Aldana engaged in protected EEO activity by opposing discriminatory assignment practices, hostile work environment conditions, and unequal treatment of older and minority PEG agents.

270. Aldana raised concerns internally and through the EEO process regarding his continued assignment to PEG, the lack of rotation equity, and management's failure to address staffing manipulation.

271. HSI El Paso management was aware of Aldana's protected activity.

### F. Retaliation Following Protected Activity

272. After Aldana engaged in protected EEO activity, HSI El Paso management subjected him to retaliatory conduct.

273. Management threatened PEG agents who continued to complain or pursue EEO remedies with harsher working conditions, including the imposition of continuous on-call status.

274. Aldana was subjected to continued punitive scheduling and adverse working conditions after engaging in protected activity.

275. These actions constituted materially adverse employment actions that would dissuade a reasonable employee from engaging in protected EEO activity.

### G. Administrative Exhaustion

276. Aldana timely initiated EEO counselor contact and filed a formal EEO complaint alleging discrimination based on race, age, hostile work environment, and retaliation.

277. The Agency failed to timely complete the Report of Investigation within the required regulatory timeframe.

278. Aldana pursued administrative remedies through the EEOC process, including filing motions addressing the Agency's noncompliance, and ultimately received a Final Agency Decision.

279. Aldana has exhausted all administrative remedies, or alternatively constructively exhausted those remedies due to the Agency's failure to comply with regulatory obligations.

### H. Harm and Damages

280. As a result of Defendant's discriminatory and retaliatory conduct, Aldana suffered loss of professional opportunities, emotional distress, and disruption to his career and personal life.

281. Aldana was denied the opportunity to work in a discrimination-free environment and to compete fairly for assignments consistent with his experience and tenure.

282. Defendant's conduct caused continuing harm that can only be remedied through judicial intervention.

## PLAINTIFF #5 – JOSE ARMENDARIZ

### A. Background, Experience, and Qualifications

283. Plaintiff **Jose Armendariz** is a Hispanic Special Agent with Homeland Security Investigations ("HSI") assigned to the El Paso Field Office. At all times relevant to this

action, Armendariz was a fully credentialed federal criminal investigator responsible for carrying out HSI's law-enforcement mission within the El Paso Area of Responsibility.

284. Armendariz possessed the training, qualifications, and experience required to perform complex enforcement duties, including narcotics interdiction, port-based enforcement activity, coordination with partner agencies, and preparation of investigative reports and referrals for prosecution.

285. Prior to the discriminatory and retaliatory conduct described herein, Armendariz performed his duties competently and had no record of disciplinary action or performance-related deficiencies.

286. Armendariz is a highly experienced federal law enforcement officer with more than two decades of service to the United States government.

287. He began his federal career with U.S. Customs and Border Protection as a Border Patrol Agent, where he developed extensive operational experience in border security, interdiction, and enforcement operations.

288. Armendariz later joined Homeland Security Investigations (HSI) as a Special Agent and was assigned to the El Paso Field Office. Throughout his career with HSI, he has served on multiple specialized task forces and joint operations, including assignments involving narcotics investigations, border enforcement initiatives, and interagency task force work. He has participated in BEST and HIDTA operations and has worked collaboratively with federal, state, and local law enforcement partners.

289. Armendariz has also served in leadership and mentorship capacities, including acting supervisory roles and as a Field Training Officer. He has received awards and commendations for his performance and has maintained a strong professional reputation.

290.  At all relevant times, Armendariz was fully qualified for his position as a Special Agent and met or exceeded the Agency's performance expectations. He had no disciplinary history that would justify adverse treatment or assignment decisions.

291.  Despite his qualifications, experience, and record of service, Armendariz was subjected to the same discriminatory and retaliatory practices described herein, including punitive assignments, disparate workload expectations, and adverse treatment following protected EEO activity.

### B.  Assignment to the Port Enforcement Group

292.  In or around 2023, HSI El Paso management assigned Armendariz to the Port Enforcement Group ("PEG").

293.  Armendariz did not request assignment to PEG and was not provided with neutral, objective criteria explaining his selection for the assignment.

294.  At the time of Armendariz's assignment, PEG was widely known within the El Paso Field Office as a punitive and undesirable unit characterized by chronic understaffing, excessive workloads, and limited opportunities for rotation or advancement.

295.  Despite the availability of alternative staffing options and the assignment of younger and favored agents to specialty groups, management retained Armendariz in PEG.

### C.  Disparate Treatment and Unequal Assignment Practices

296.  During Armendariz's tenure in PEG, HSI El Paso management failed to apply neutral or consistent criteria for agent rotation.

297.  Younger agents and favored agents were routinely rotated out of PEG after relatively short assignments, while Armendariz and other older agents and agents of color were retained in PEG for extended periods.

298. Armendariz observed that agents with less experience and fewer qualifications were assigned directly to specialty groups and insulated from PEG's burdens.

299. Management justified Armendariz's continued PEG assignment with vague and shifting explanations unrelated to performance or legitimate operational needs.

300. These practices were consistent with a broader pattern of discriminatory assignment decisions within HSI El Paso that disproportionately burdened older agents and minority agents, including Armendariz.

### D.  Hostile Work Environment Conditions

301. As a PEG agent, Armendariz was subjected to excessive workloads, unpredictable schedules, and near-constant on-call expectations.

302. PEG agents were required to respond to port-based narcotics interdictions across multiple Ports of Entry, often with insufficient staffing and limited supervisory support.

303. Supervisors minimized PEG agents' contributions and treated PEG as a dumping ground rather than a legitimate investigative unit.

304. Armendariz experienced repeated disregard by management when concerns were raised about staffing shortages, workload inequities, and unequal treatment.

305. The cumulative effect of these conditions altered the terms and conditions of Armendariz's employment and created a hostile work environment.

### E.  Protected Activity

306. Armendariz engaged in protected EEO activity by opposing discriminatory assignment practices, hostile work environment conditions, and unequal treatment of PEG agents.

307.  Armendariz raised concerns internally and through the EEO process regarding his assignment to PEG, the lack of rotation equity, and management's failure to address staffing manipulation.

308.  HSI El Paso management was aware of Armendariz's protected activity.

### F.  Retaliation Following Protected Activity

309.  After Armendariz engaged in protected EEO activity, HSI El Paso management subjected him to retaliatory conduct.

310.  Management threatened PEG agents who continued to complain or pursue EEO remedies with harsher working conditions, including the imposition of continuous on-call status.

311.  Armendariz was subjected to continued punitive scheduling and adverse working conditions after engaging in protected activity.

312.  These actions constituted materially adverse employment actions that would dissuade a reasonable employee from engaging in protected EEO activity.

### G.  Administrative Exhaustion

313.  Armendariz timely initiated EEO counselor contact and filed a formal EEO complaint alleging discrimination based on race, age, hostile work environment, and retaliation.

314.  The Agency failed to timely complete the Report of Investigation within the required regulatory timeframe.

315.  Armendariz pursued administrative remedies through the EEOC process, including filing motions addressing the Agency's noncompliance, and ultimately received a Final Agency Decision.

316.  Armendariz has exhausted all administrative remedies, or alternatively constructively exhausted those remedies due to the Agency's failure to comply with regulatory obligations.

### H.  Harm and Damages

317.  As a result of Defendant's discriminatory and retaliatory conduct, Armendariz suffered loss of professional opportunities, emotional distress, and disruption to his career and personal life.

318.  Armendariz was denied the opportunity to work in a discrimination-free environment and to compete fairly for assignments and working conditions consistent with his qualifications.

319.  Defendant's conduct caused continuing harm that can only be remedied through judicial intervention.

## X.    CAUSES OF ACTION

### COUNT I

### TITLE VII – RACE DISCRIMINATION

**(42 U.S.C. § 2000e-16)**
**Asserted by Plaintiffs Brown, Chavarria, Corral, Aldana, and Armendariz**

315.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 314 as if fully set forth herein.

316.     Title VII prohibits federal agencies from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment because of race.

317.     Plaintiffs are members of protected racial classes, including African American and Hispanic employees.

318. Plaintiffs were qualified for their positions as HSI Special Agents and performed their duties competently, as evidenced by years of service, commendations, awards, and successful enforcement activity.

319. Defendant subjected Plaintiffs to adverse employment actions, including but not limited to:

- discriminatory assignment to and retention in the Port Enforcement Group ("PEG");

- denial of equitable rotation and reassignment opportunities;

- disproportionate workloads and on-call requirements;

- stigmatization as underperforming agents;

- denial of leadership opportunities and career advancement.

320. These adverse actions were imposed under subjective and non-neutral criteria controlled by common supervisors, rather than legitimate operational needs.

321. Similarly situated non-minority agents were treated more favorably, including being rotated out of PEG, assigned to specialty groups, and insulated from PEG's burdens.

322. Defendant's stated reasons for Plaintiffs' treatment were false, inconsistent, and pretextual, as shown by:

- PEG agents' documented productivity;

- inflated staffing rosters masking understaffing;

- contradictory explanations for assignment decisions;

- management statements characterizing PEG as punishment.

44

323.     Race was a **motivating factor** in Defendant's decisions affecting Plaintiffs, even if other factors were also considered.

324.     Defendant's conduct violated Title VII.

## COUNT II

### TITLE VII – HOSTILE WORK ENVIRONMENT

**(42 U.S.C. § 2000e-16)**
**Asserted by Plaintiffs Brown, Chavarria, Corral, Aldana, and Armendariz**

325.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 314.

326.     Defendant subjected Plaintiffs to a **racially hostile work environment**.

327.     Plaintiffs were exposed to **severe and pervasive conduct**, including:

- repeated stigmatization of PEG agents as unproductive;

- derogatory supervisory statements made to internal and external partners;

- excessive and unsafe workloads;

- retaliatory threats of continuous on-call status;

- indifference to complaints regarding discrimination and safety.

328.     The harassment was **objectively offensive** and **subjectively perceived as abusive** by Plaintiffs.

329.     The conduct altered the terms and conditions of Plaintiffs' employment by undermining professional standing, imposing unreasonable demands, and creating fear of retaliation.

330.     Supervisors responsible for the harassment were Plaintiffs' direct managers and decision-makers, whose actions are imputed to Defendant.

45

331.     Defendant knew or should have known of the hostile conditions and failed to take prompt or effective remedial action.

332.     Defendant's conduct violated Title VII.

## COUNT III

## TITLE VII – RETALIATION

### (42 U.S.C. § 2000e-16)
**Asserted by Plaintiffs Brown, Chavarria, Corral, Aldana, and Armendariz**

333.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 314.

334.     Plaintiffs engaged in **protected activity**, including opposing discriminatory practices, filing EEO complaints, participating in investigations, and pursuing administrative remedies.

335.     Defendant took materially adverse actions against Plaintiffs, including:

- threats of continuous 24/7 on-call status;

- punitive scheduling and workload escalation;

- denial or removal of leadership roles;

- retaliatory TDY selection (Chavarria);

- including retaliatory denial of overtime and premium pay;

- continued PEG retention after protected activity.

336.     These actions would dissuade a reasonable employee from engaging in protected activity.

337.     The temporal proximity, escalating severity, and retaliatory statements establish a causal connection between Plaintiffs' protected activity and Defendant's actions.

46

338.        Defendant's explanations for its actions were pretextual and designed to deter EEO participation.

339.        Defendant's conduct violated Title VII.

**COUNT IV**

**ADEA – AGE DISCRIMINATION**

**(29 U.S.C. § 633a)**

**Asserted by Plaintiffs Brown, Chavarria, Corral, Aldana, and Armendariz**

340.        Plaintiffs reallege and incorporate by reference Paragraphs 1 through 314.

341.        The ADEA prohibits federal agencies from discriminating against employees who are age 40 or older.

342.        Plaintiffs are members of the ADEA protected class.

343.        Defendant subjected Plaintiffs to adverse employment actions, including:

- disproportionate assignment and retention in PEG;

- denial of equitable rotation;

- imposition of harsher working conditions.

344.        Younger agents were treated more favorably and shielded from PEG assignments.

345.        Defendant's age-based assignment practices lacked legitimate justification.

346.        Age was the but-for cause of Defendant's adverse actions against Plaintiffs.

347.        Age discrimination occurred independently of race discrimination.

348.        Defendant violated the ADEA.

## COUNT V

## ADEA – RETALIATION

## (29 U.S.C. § 633a)
**Asserted by Plaintiffs Brown, Chavarria, Corral, Aldana, and Armendariz**

349. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 314.

350. Plaintiffs opposed age discrimination and participated in protected EEO activity.

351. Defendant retaliated against Plaintiffs through materially adverse actions.

352. There is a causal connection between Plaintiffs' protected activity and Defendant's conduct.

353. Defendant's actions would deter a reasonable employee from opposing age discrimination.

354. Retaliatory actions resulted in denial of overtime and premium pay.

355. Defendant violated the ADEA.

## PRAYER FOR RELIEF

356. Plaintiffs request that the Court:

- declare Defendant's conduct unlawful;

- enjoin discriminatory and retaliatory practices;

- award back pay, front pay, and lost benefits;

- award compensatory damages as permitted;

- award liquidated damages for willful ADEA violations;

- award attorneys' fees and costs;

- grant all other just relief.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 9, 2026

Respectfully submitted,

**MENDEZ ISAAC JOUDI, PLLC**

Local Counsel for Plaintiffs
320 Texas Avenue, Suite 300
El Paso, Texas 79901
(915)444-1000
(915)209-7200 (Facsimile)
omendez@mijlawfirm.com

*/s/Oscar Mendez Jr.*
**OSCAR MENDEZ JR.**
State Bar No. 24058473

Pro Hac Attorney for Plaintiffs
/s/ Jeff T. Schrameck
    42180 Ford Rd. Ste. 275
    Canton, MI 48187
    Telephone: (734) 454-5400
    jeff@schramecklaw.com

49